The Fourth District Appellate Court of the State of Illinois has now convened. The Honorable James A. Connick presiding. This is case number 419-0685. In re the marriage of Mark and Sandy Wilson versus Robert Schaefer. Would the counsel for the appellant state your name? My name is Chip Corwin. And would counsel for the appellee state your name? My name is Jim Kern, Your Honor. The appellant may proceed. Thank you, Your Honors. Good morning. May it please the court. My name is Chip Corwin. For the plaintiffs, Mark and Sandy Wilson, and we're asking the court to reverse the judgment of the trial court and order a new trial. This is a case of a trial that suffered from errors right from the start that really only got worse as the trial went along, depriving plaintiffs of a fair trial. The trial court erred in three really major ways. The first is that we really don't have a complete and adequate record of the trial, the sidebars in particular, due to the trial court's miscommunication about whether sidebars were, in fact, on the record or not. It turns out that they were not on the record, and we proceeded to the whole trial thinking that they were. The second issue is the court abused its discretion in limiting the plaintiff's use of a peremptory strike, and the court trial court also abused its discretion in entering several vague, unclear, imprecise, overbroad orders in limine, and then on top of that, shifting its rulings on those orders several times midway through the trial, which resulted in a lot of confusion, number one, and also resulted in a lot of relevant evidence being excluded. So the first issue, the incomplete record, I think, really speaks for itself. The issue is whether sidebars were on the record or not, and the court can read in the record on page 427, second day of jury selection, we attempted to clarify that point with the trial court as to whether the sidebars were being recorded, meaning on the record, or whether we'd have to make our record after, and we were left with the impression that they were on the record, and as it turned out, we found out many months later, they were not, and normally, if there's an inadequate record, that's the appellant's fault. That's the appellant's job, I recognize, to make sure there's adequate record, but in this case, we sought clarification from the court as to what was on the record and whether or what was not, and we received false information. You can read it and make up your own mind, of course, but our position is that the inadequate record here is the trial court's fault, and as such, we should be awarded a new trial. What's the prejudice? Well, the prejudice is that we don't, we, this trial is several, the vast majority of these we don't know. We have an idea of what's there. Of course, we know what's there, but we don't know what's not there. We didn't know it wasn't being transcribed, and so it's hard for us to say what didn't get recorded and what is missing because we just don't know. We were proceeding, relying on the facts, relying on the trial court's impression that that was all part of the record, and it turns out it wasn't, and that for 30 years in Champaign County, sidebars are not on the record, and we didn't know that despite seeking clarification on that point early on so that we would know. The second issue is the court abused its discretion in really the issue here is what should be done when a potential juror fails to answer or answers incorrectly a direct question during voir dire. The issue really isn't about whether backstriking is appropriate or not. It's what do you do when you've asked a question to a juror, a potential answer, and you find that out pretty soon thereafter. That's the issue, and the case law for over 110 years in Illinois is that when that happens, even if the panel has been tendered, the party that tendered the panel should get a chance to go back and further voir dire that the argument from the trial court and from the defendant is, well, you get to ask whatever questions you want. You had as much time as you wanted. You weren't limited at all in that way. That's all true, but that's not what we're saying. This isn't the case where after doing voir dire, I sat down back at the council table and said, oh, I wish I would have asked this question. I wish I would have asked that question. Hey, can I go back and try again? That's not what happened. What happened is I asked a direct question to a potential juror, and the record reflects that this juror, either Mr. Wentworth, either said no, which was untrue, or didn't answer, stayed silent, or indicated in some other way, maybe non-verbally through body language, that he never had a hip surgery. And then 10 minutes later, a few minutes later during defense questioning, we find out that that's not true. And whether he did that on purpose or on accident, and there's some suggestion that he had some hearing problems, whether he couldn't hear, it could have been any of those things. We don't know, but it really doesn't matter. What's important is that I asked a direct question, didn't get a truthful response. We found out about it, and instead of fixing it, nothing happened. We weren't granted any relief at all. And the case law in Illinois is that when that happens, it's a matter of discretion, but the court can reopen that panel and allow the plaintiff or the party, whichever strikes. We had, I think, three left at that point. We could have used one. Mr. Corwin, did you ask the trial court to reopen the panel for further questioning? We did. Now, what happened here is after we tendered the panel to the defense, we went up to the bench again, this was during a sidebar, and we objected to the procedure that was taking place because we thought most trials that we've done, we get to wait to hear the defense questioning before we have to use one of our strikes. And we objected to not being able to hear the defense questioning before we were forced to use our strikes. And so we made an objection to the process, and we said, the court said, well, your objection is preserved, and we'll take it up at the end of the day. And then at the end of the day, you know, running late, so we'll take it up in the morning. And so that's when we took it up the next morning, and we said we'd like to reopen that panel and use one of our strikes that we have on Mr. Wentworth. And now, since then, there's argument for others in the ruling, the post-trial order, an argument from defense that, well, in the meantime, the court swore in the panel, and so now nothing can be done, and that we've somehow waived the issue. So from our perspective, we've been told that the issue is preserved, and now after the fact, we're being told, actually, the whole time it wasn't preserved. Once the trial court swore in, there's nothing you can do now. And that doesn't seem like that should result in a waiver on our part when the trial court has told us it's preserved, and then we'll take it up tomorrow morning. Counsel, did you specifically bring up Wentworth as the prime example or as an example of your issue after defense accepted that panel and before the panel was sworn? We did not. We objected between the time that we tendered the panel and before the defense started questioning. Now, at that point, we didn't know that Wentworth had answered our question dishonestly yet, and we'd already been told that the issue had been preserved. So we didn't go up again and object again to say, look, what we said was going to happen just happened. We did not do that, but we'd been told at that point that the issue had been preserved. Well, the issue might have been preserved about the process of tendering panels and whether there could be additional questioning, but once you discovered that Wentworth had given an inaccurate answer, and I'm saying inaccurate rather than dishonest because it seems to me the record shows that this gentleman was hard of hearing, but regardless of that, whether it was inadvertent or purposeful on his part, as soon as you discovered that before that panel was sworn, wouldn't it have been appropriate to object to Mr. Wentworth by saying, Judge, we'd like to approach the bench? Perhaps you did, and that's something that's not recorded, but I'm going to ask for your representation whether or not at that point you specifically objected to Wentworth, separate and apart from the process that you had already objected to about the way the judge moved from one panel to the next or moved from questioning by one counsel to the other counsel. We did not. That's my recollection. You've answered my question. Okay. I think it would have been appropriate. We certainly could have done it, but I don't think it was necessarily necessary to do that. Understood. Okay. So the final point on that is the Supreme Court of the United States says if you're impairment of right to property strikes a reversible error, even without showing prejudice. The final issues that I want to take up are the issues with the orders in limine that were entered. I think this is really sort of the major issue, even above and beyond the first two. The court entered several vague and nonspecific orders in limine and applied them inconsistently throughout the trial, which led to really a cascading of errors and in excluding evidence that was obviously relevant and which, in fact, this very court five years earlier, the last time this case is on the field, cited as the reason to reverse summary judgment, which is why we're at trial in the first place. The appellate court, this district in particular, has issued a lot of case law on orders in limine and the guidelines are pretty clear. Their orders in limine should be clear and is worse than no order at all. An order should be in written form to allow parties to understand what evidence is at issue. Orders in limine should not unduly restrict an opposing party's presentation of the case. And even if an order meets all those guidelines, if a proponent of the order opens the door to the evidence, then the evidence can come in and the other side can everything that was supposed to happen with orders in limine did not happen here. There were a number of orders. As we outlined in the brief, the conservative treatment order in limine, where this is one that we actually won in the pretrial by citing the court's opinion or rule 23 order reversing summary judgment, where the court determined that the fact that Mark still had conservative treatment options available to him was a reason to reverse summary judgment. And then, so we initially had won that. And then we get to the testimony of our expert. And on cross-exam, the defendant spends, I think, a page or two pages of the transcript trying to get our expert to admit that Mark didn't have any conservative treatment options. They failed to get that admission. But then before we're able to redirect and rehabilitate our expert witness, they move to impose the order barring any discussion of Mark's conservative treatment options. And the court allowed it. And the court's theory in allowing this was, and we said, we made the points, well, we won on this, number one. Number two, this is the whole point of the fourth district's reversal of summary judgment. Number three, they've just opened the door to that by cross-examining, aggressively cross-examining our witness time. We can't now follow up on that. And the trial court's words were, yes, just because something is not ordered doesn't stand. And that is blatantly not the law. That's Beasley v. B. Huffman, which we cited at the court at the time, and which is black letter law in case after case. If you open the door to evidence, if you don't object to an order in limine and evidence comes in, you can't then reimpose it afterwards on the other side. So that was the first one. Not to mention the fact that even without an order in place, we should have been able to rehabilitate our expert witness in a medical malpractice case on that point. And after he's been cross-examined on conservative treatment options, we should have been able to rehabilitate separate and apart from the issue that is obviously relevant to the case. The second one was the order concerning what is and was not in Dr. Schaffer's chart. This is plaintiff's Exhibit 5. This is one that we initially won on to in the pre-trial motions, the argument was we shouldn't be able to say or point out that Dr. Schaffer in his chart never documents the discussion of the risks of the surgery, of risk of sciatic nerve injury with Mark. This is circumstantial evidence that the conversation didn't happen because he documents a lot of other stuff, but he doesn't document any discussion of the risk of sciatic nerve injury. So that's circumstantial evidence that the conversation didn't happen, and we won. And then during opening statement, we're about to say the evidence is going to show that that discussion isn't in the chart, and the defense objects and says this is the subject of an order in limine, and this is one of the sidebars that didn't really get recorded very well. And the court changes ruling and said you can't point out what's not in the chart. So we were prohibited from that point on from pointing out or asking any witnesses about what was not in Dr. Schaffer's chart. Later though, the court sort of shifted its ruling again and did allow the defendant to ask our expert Dr. Smith whether he documents every specific risk in this chart. But then when it time for their expert to go, we wanted to ask Dr. Lux, their expert, do you document in your chart every specific risk? And the court wasn't going to let us do that. And then he wouldn't let us ask. He reviewed Dr. Schaffer's chart, so he wouldn't let us ask did Dr. Schaffer document his chart, any discussion about the risk of sciatic nerve injury. The last two orders are personal practice order in limine. Again, this one was vague and it was seeming like lots of things ended up under this umbrella of this order. And then the complications order in limine, which started out as an order, quote, to prohibit us from making mention of other patients with complications. And then it evolved into this general bar of discussing anything related at all to how to sciatic nerve injury. We couldn't discuss how often it occurs, how it's caused, how often it results in a permanent injury. And as we discussed in the brief, this is all important information for a jury because the issue that the trial court was trying to limit this case to one issue, which is whether Mark was ever informed of the risk of nerve injury. But there's a second issue, which is what would a reasonable person in Mark's position have done if he had known of the risks? And for a reasonable person to know what he would have done, it's relevant evidence to know how often the injury occurs. Is it 1% of the time? Is it 3% of the time? How is it caused? How often is it permanent? These are all things that a person would want to know when trying to evaluate it. And we were barred from presenting any of that evidence. And I think that really resulted from the court limiting this case to one issue when it's really a two-issue case. Was Mark informed of the risk, but also what would a reasonable person in Mark's position have done had he known of the risks?  Thank you, counsel. Apple Lee. Thank you, Your Honor. I'm Jim Kearns. I'm here speaking for Dr. Schaffer. I want to start by just a short summary of what exactly was the situation with Mark Wilson in the summer of 2004. At that time, he was suffering from significant osteoarthritis, primarily at that point in his right hip. It had disabled him to the point where he couldn't work. He couldn't stand for any length of time. He couldn't sit for any length of time. He couldn't walk for any length of time. Everything that he wanted to do caused him pain if it involved moving his leg. He had tried conservative treatment. Now, conservative treatment was described by the plaintiff's expert as pain medication, physical therapy, steroid injections, rest, and losing weight. He did not suggest that delaying the surgery had anything to do with anything. He just pointed out in the summer of 2004, and I'm quoting Dr. Smith's testimony, it's fair to say by August 2004, Mr. Wilson had failed conservative medical treatment and conservative therapy. He wanted surgery and he needed it. I would have recommended surgery to him as well. That's what he was looking for. That's what he got. He went to Dr. Schaffer, not because he heard of Dr. Schaffer, but because Dr. Schaffer was the first available surgeon he could get into to have this procedure done. The surgery was performed in August. It was, as far as the hip itself is concerned, successful. The pain in the hip and the limitation of motion of the hip were alleviated, but it also was unsuccessful because the sciatic nerve was injured with associated drop foot and pain, something which is a recognized complication of the surgery, and it happened to Mr. Wilson. Now, excuse me, there's no claim of malpractice in performing the surgery in this case, only the failure to obtain informed consent. The jury took the case. They were out for about an hour. They came back with a verdict for Dr. Schaffer, and this appeal follows. There are a number of bases on which this appeal rests, and I want to discuss as many of them as I can in the 20 minutes that we have here. First, and first raised by the plaintiff, the record was incomplete, and in essence, he's saying that Judge Ford lied to him by telling him that the sidebars were on the record. If you look at the record, you'll see that the question asked of Judge Ford was, are these being recorded? His answer was, well, they should be, and they were. I got, by my count, 40 of them here. Forty sidebar conferences were all typed up. There's missing words here and there, but there's no question that in the course of reading those sidebars, you know exactly what the subject matter was. Mr. Corwin suggests that there were other missing sidebars. He hadn't suggested what they were about or when they occurred or what the rulings were or how in some way he was prejudiced by something, and that's because he hasn't got any idea. I'll suggest to you that there are no missing sidebars. Now, what Judge Ford said when he asked for the sidebars to be transcribed was, we don't normally transcribe the sidebars and make them part of the record, but what we do is, if you want a sidebar transcribed and made part of the record, file a motion. They filed a motion. The sidebars were transcribed and made part of the record. They're part of the record now. Why this is still an issue is just a mystery to me, I got to say. Now, I want to talk to you about the jury selection as well. The jury selection, Mr. Corwin has correctly stated that there was no backstriking, and everybody agreed with that. Mr. Wilder was offered the option of filing a motion to permit backstriking. He said, no thanks, don't need to, but it was clear after the first panel that the plaintiff's idea of backstriking was different from our idea and from Judge Ford's idea. Their notion was, you get to use your peremptories after all the questions have been asked, then you can't backstrike. In Champaign County, for as long as I've been around, you question the jurors, you accept them, and you turn them to the other side, and that's it. You don't get to wait until their answers are given. Now, perhaps they didn't understand that with the first set of jurors, but nobody complained about the first set of jurors. They did make that record at that point, and the judge said, you can make your record complaining about how we do it here in Champaign County later, and they did in the morning. But at that time, Mr. Wentworth hadn't even been questioned yet. He was questioned afterwards, and it's interesting to note that if you look at the questioning of Mr. Wentworth, one of his answers was, I can't hear everything that's going on. I can't hear the question particularly of the lawyers. And in one of those sidebars, the second sidebar on that day, Mr. Wilder suggested dismissing Mr. Wentworth for cause because he couldn't hear anything. He missed 90% of the testimony, and the judge said, no, we're not dismissing him for cause. We can give him some hearing assistance. If you want to use a peremptory on him, go right ahead. Of course, they didn't. Now, this was clearly before Mr. Wentworth made these statements that they're complaining about now. The difference between what happened when Mr. Corwin was questioning the jurors is he didn't ask each one of them specifically about anything. He asked the four and said, any of you had this? Any of you done that? Any of you had this? Matter of fact, it seems pretty clear to me that he didn't hear the question because when he was asked specifically, each juror was asked specifically by Ms. Monfort, he said, yeah, I should tell you, I've had the hip surgery. And I want to mention that virtually everybody on that panel either, well, he was the only one that had hip surgery, but everybody knew somebody, it had a relative or a friend that had hip surgery. Common knowledge among all the jurors that hip surgery was, they knew somebody that had it. There's no basis for considering that the fact that he had hip surgery pushes him one way or the other. Does that make him a doctor who had a problem when he didn't have one? Who knows? But the fact is, no objection was made to Mr. Wentworth at the time the questioning was done and before the jury was sworn. And I think that's important because now the plaintiffs are insinuating. They're not saying, but they're insinuating that Mr. Wentworth was dishonest, that he was not telling the truth when he was being questioned by them. If he was being dishonest and he wanted to get on the jury, he didn't want him to know he had hip surgery. Why would he suddenly start being honest when he was questioned by Ms. Monfort? He didn't suddenly start being honest. He suddenly started being questioned directly about his own personal experience. And that's how she got it out. Now, I agree that it was well within Judge Ford's discretion to reopen that panel and let them exercise peremptory. But that's a matter of his discretion. And Judge specifically stated in the course of the record that I don't find any evidence of dishonesty here. It's just a time. They forget something and then they remember it later. I'm exercising my discretion not to reopen the panel and we move on. And that's what happened there. I want to talk about some of these specific... Mr. Kearns, before you go forward, I have a question for you. Yes, sir. Is it my understanding that you are saying that once a panel is tendered by plaintiff to defendant, even if defendant's questioning establishes that that potential juror may be biased or prejudiced, plaintiff has no right to go back and backstrike is what I would call it. Maybe that's not the right terminology, but that's the practice in Champaign County? Well, Judge, I think the practice in Champaign County is for the judge to exercise his discretion. He's been listening to the questions and determine whether this inaccurate statement is of significance. And if it's of significance, it would be his obligation, I would say, to open the panel and let him do it. But Judge Ford determined it wasn't of any particular significance. And I think that was well within his discretion. Okay. Open the panel and let them do it. What do you mean? Open the panel and allow plaintiff to say, you know, this potential juror should be removed for cause? No, no, no. Saying only he would have to use a peremptory, even though the juror is prejudiced? Well, Judge, I guess I didn't make myself clear. I apologize. If he was going to complain of a problem for cause, it was his obligation to make it the statement. He had the ______. Okay. I'm not hearing anything. Yeah. He's frozen up on my screen. Mine as well. Yeah. There is an auditory problem. Mr. Corwin, can you hear? Yes, I can. Okay. Thank you. Thank you, sir. The point I wanted to make, Judge Turner, is that the challenge for cause is different than a peremptory challenge. They did not suggest, and they haven't suggested in their appeal, that they had a challenge for cause. That would have been a different animal altogether. But it would be one they should have taken up the night before. But he asked to open it to do a peremptory challenge, and that is certainly within the discretion of the trial judge. That's the point I wanted to make. Thank you for that clarification. Now, before I go into the other things, I do want to talk about the standard of care, which was established by the plaintiff's expert in this case. Clearly, you have to warn the witness or patient of the possibility of nerve injury. Nobody ever argued anything to the contrary. But what you don't have to do, and no one testified that you do have to do, is you don't have to put it in writing. You don't have to give him a handout. You don't have to chart in the chart, I warned him about this and that and the other thing. And you don't have to tell him, I told him X percent chance of failure. None of those are requirements of the standard of care. Now, what Mr. Corwin seems to be objecting to was that when Ms. Monfort was questioning his expert, she said, you don't have to tell people, you don't have to put in the chart what exactly you told him, right? And he said, right. He said, you don't do it yourself either, do you? Right. So all the questioning about of Dr. Smith was simply to reinforce what the standard of care was. It wasn't a question of misleading the jury in any way. Now, Mr. Corwin has also conflated two things which I think need to be made clear, and that is a conservative treatment. Conservative treatment does not mean delaying the surgery. That was never conservative treatment. They asked Dr. Smith what conservative treatment was, and he said, you take medicine, you take it easy, you learn to live with it. That's what happened. And that, by the way, he also said it failed, Mr. Wilson, but their expert and nobody ever said that delaying the surgery had anything to do with this case. Either you were going to have the surgery or you weren't. There's no relevance whatsoever to delay. That's the point that they were trying to get in all the time and that we were trying to keep out. It's not relevant. The other conservative treatment we agreed could be argued, and it was argued. There's no question that they got to point out that he didn't have to have the surgery, and he could have done all those things, and nobody objected to it. We didn't object to it either because that was the issue. I also want to point out that the delay was not a central issue in Wilson 2. This is Wilson 3, by the way, third time we've been up here. In Wilson 2, it was mentioned in passing that he could have delayed the surgery, but no one ever suggested that delaying the surgery was an important issue. In fact, the court said, here's the question. If he wasn't, if he would have been warned, would he have had the surgery? Delay means nothing. What does it prove? Does it prove that he wasn't talked to? Does it prove that, what does it prove? Mr. Wilder said in arguments on the motions eliminated, I'm not suggesting to you that you would have got a different result with delay. He wasn't, and he didn't. Therefore, delay was utterly irrelevant. Now, I want to talk briefly about the plaintiff's complaint about the form of the motions eliminated. There's 113 pages of transcript where the judge heard arguments on the motions eliminated. There were lots of motions eliminated at that time. Krista Clinic was also a part of the case and they had a number of motions. We had a number of motions. Mr. Wilder never suggested that he didn't know what was relating to those motions eliminated. He never suggested that he didn't understand what he could or could not do. He understood perfectly and the judge made it clear what his rulings were. And the only issue is whether or not these other matters were relevant or not, given the standard of care, given the status of the case. The inadequacy of the motions themselves was never challenged at the trial court either. The only thing that was challenged was that the judge was incorrect on some of the rulings, and I'm prepared to deal with that right now. The first one that was also alluded to earlier by Mr. Corwin is that the fact that it was not charted didn't get into the record, even though originally the judge denied that motion. Not true. The judge only said we're not going to get into the fact that the charting, failure to chart was a violation of the standard of care. That's what he said they couldn't do. They did get into the chart. They had Dr. Schaefer get up and say, testify, I didn't write nerve palsy, I didn't write drop foot, I didn't write pain. And then in the closing argument, they argued that that meant it didn't happen. They got the argument into the case. Why he suggests otherwise, I don't know, but we cited the transcript of the thing in our brief, and that was not kept out of the case. It just wasn't. He also complained about the details of the surgery not being relevant. The details of the surgery aren't relevant. They wanted to get into them, and my opinion, they wanted to go into some detail of the surgery and see if the jury would want to second guess the decision Dr. Schaefer made. The surgery wasn't the issue. The informed consent was the issue. He was entirely proper in keeping that out. And while we're on the subject of keeping things out, they also asserted in their brief here, I don't know if Mr. Korn read it today, they also asserted that throughout the trial, we tried to argue that anesthesia was the cause of the injury. As if, in other words, don't blame Dr. Schaefer. It was his anesthesiologist. That was never, ever argued. In the opening statement, Mr. Corbin said, you know, they're going to agree with us that the injury, which was suffered by Mr. Wilson, was as a part of the surgery. First person he puts up on the stand is Dr. Schaefer. He says, Dr. Schaefer, isn't it true that the surgery was the cause of the injury? Dr. Schaefer said, yep, it is. That was it. It never was anything else and no one argued anything else. He also wanted to get into, let's get into Dr. Lux. Dr. Lux's testimony in his discovery deposition was, I give him a handout as a part of my standard practice. We cited the did it differently than did Dr. Schaefer, but there was no allegation that the way that Dr. Schaefer did it violated the standard of care. It was exactly the same as done by the plaintiff's expert. So bringing up the fact that Dr. Lux did it differently is only saying, okay, there's two ways to do it. He does it that way, I do it this way. This way is irrelevant. It had nothing to do with violating the standard of care and it was just another attempt to get the jury to say, you know, maybe they should be giving those guys a handout. Same thing with the fact that there was a handout. There was a handout available at Christie Clinic at the time that Mr. Wilson went there. Everybody agreed they don't know whether he got it or not. He said, I don't remember whether I got it or not. And we said, we don't remember whether you gave it to him, but it doesn't matter because giving it to him wasn't a requirement of the standard of care. And bringing up that pamphlet would do nothing more than raise another issue that is not relevant to the discussion today. Their argument in their brief is, well, if we don't point out that he didn't get the pamphlet, the jury is going to think, A, there was a pamphlet and B, he got it. Why are they going to do that? The pamphlet didn't even come up. And of course, furthermore, the fact is that there's no testimony that he didn't get it. There's testimony that we don't know whether he got it or not. The pamphlet thing is just a red herring and it should be disregarded. Same thing about testimony of other problems with other surgeries. He wanted to bring that in. That's black letter law that you don't bring in other problems with other surgeries. And they wanted to do it because they said, well, you know, we wanted to prove that he knew that there was a possibility of nerve injury. He testified that he knew there was a possibility of nerve injury from day one and he warned them about it. That was just another attempt to get something in to disparage Dr. Schaffer that had nothing to do with the relevance of the case. I think that's all I really have for you, Your Honor. I'd be happy to answer any questions if there's something that I think I missed. But the fact of the matter is he got a fair trial. The jury heard all the evidence. The jury found in favor of Dr. Schaffer. In this case, it is not erroneous. There's no error in this case in any place. Thank you very much. Thank you, counsel. I see no further questions, so we'll go to rebuttal. Thank you, Your Honor. First of all, the issue of delaying versus conservative treatment. The issue was the order in limine so that we couldn't argue that delaying the surgery would have resulted in a different outcome. In other words, if he delayed, he wouldn't have eventually gotten sciatic nerve injury. That's what we couldn't argue. We never even fought on that point. We never thought we should argue that. We never tried to. But we did say, wanted to say, that he could have delayed the surgery. And in paragraph 52 of Wilson 2, this court, the experts, while testifying hip replacement was in Mark's future, acknowledged Mark could choose other alternatives, such as continuing with therapy, comma, delaying surgery, comma, instead of living with the pain. So it is relevant. It's right in the court's last opinion. We could talk about he had the option of delaying continuing with conservative treatment. And that's the evidence that we wanted to bring out. And that's the evidence that midway through the trial, we were suddenly barred from bringing it out again. Mr. Kern said that the jury came back in an hour and that the jury heard all the evidence. No, they didn't. They heard at best maybe half the evidence. And it's no surprise they they only heard about half the evidence. In terms of the inadequate record, again, the transcript really speaks for itself, okay? We asked, is it being recorded? Or do we have to make a record after? So read in context, it's pretty big stretch to think that we were just asking out of idle curiosity if the recording system was on. We were asking if it's on the record. That's why we said, or do you have to make a record after? And the court let us proceed through the entire trial under the impression that we were making a record at these sidebars, when in fact we were not. To begin his argument, Mr. Kern's argued a lot of facts. Essentially, as part of the strategy, it seems like the defense in this trial has been to just relitigate the last appeal, which they lost. There is no dispute that Mark could have continued with conservative treatment. He could have delayed surgery. Was he in pain? Yes, of course he was in pain. That's why he went to see an orthopedic surgeon. But that doesn't mean that anybody who's in pain just goes ahead and gets a surgery. That's why you got to inform people of the risks and you have to let them make their choice. That's the point. And so we're not disputing that he was in pain. Of course he was in pain. People who aren't in pain don't go see orthopedic surgeons in the first place. The issue of personal practice goes to Dr. Lux's credibility. He testified, this is Galena V. Watson, Rush V. Hounding, cases out of this court. It's not about the standard of care. That's the red herring that everything has to be about the standard of care. It's that he's testifying as a retained expert that all you have to do is, or that Schaefer met the standard of care, whatever he did was correct. But he does something different in his practice. He goes above and beyond that. So that affects his credibility. It's not relevant to what the standard of care is maybe, but it's relevant to his credibility that he does something different. And that's what's laid out in Galena V. Watson and Rush V. Hounding. Finally, in the last minute here, the issue of bringing up the instance of the complication. The jury was told that it's a known complication and that's all they were told. They were not allowed to explain how it happened. We're not allowed to say how often it happens, which you would want to know if you're supposed to determine whether a reasonable person in Mark's position would get this surgery despite the risks. You might want to know how often the injury occurs. Does it occur 90% of the time or a tenth of a percent of the time? That's an important consideration if you're determining whether a reasonable person would do that or not. If you're a 53-year-old who's still active, going to the gym, shooting hoops, etc., you want to know, well, am I going to have a 3% chance of permanent injury or what's the percentage here? In opening, Mr. Kearns brought up that Schaefer had done 900 surgeries, but then they didn't want to let us ask how many of those resulted in an injury. That's relevant and he opened the door to that. Thank you. Thank you, gentlemen. We'll take this matter under advisement and await the readiness of the next case.